Filed 3/7/14  Certified for publication 4/2/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071857 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F00219) |
| v. | |
| JUSTIN STEELE, | |
| Defendant and Appellant. | |

A jury found defendant Justin Steele guilty of pandering E. L. to become a prostitute; procuring E. L. to leave California for prostitution; pimping of E. L. and D. R.; human trafficking of E. L. and D. R.; making criminal threats against E. L.; forcible oral copulation of E. L.; kidnapping of D. R.; abducting D. R. for prostitution; assault of D. R. by force likely to produce great bodily injury; and pandering D. R., age 17, to become a prostitute.  The jury found that defendant personally used a deadly weapon -- hot cooking grease or oil -- in the commission of the criminal threats count.  The trial court found true two strike allegations.  Defendant was sentenced to prison for 176 years to life.

On appeal, defendant contends:  (1) the evidence of abducting D. R. for prostitution was insufficient; (2) instructing the jury with CALCRIM No. 1190, a rule of substantive law, immediately following CALCRIM No. 301, an instruction on witness credibility, erroneously suggested "that the law requires a special deference to the complaining witness's credibility"; (3) Penal Code[1] section 654 bars separate punishment for kidnapping D. R.  and human trafficking of D. R.; (4) the trial court's refusal to permit discovery of D. R.'s medical records violated his confrontation and due process rights; and (5) due process requires limited disclosure of the medical records to the parties for the purpose of briefing under seal of the discovery issue.  We affirm.

DISCUSSION

I

*Sufficiency Of Evidence Of Kidnapping For Prostitution*

Defendant contends the record contains insufficient evidence to support his conviction of kidnapping D. R. for prostitution.  Specifically, he claims there was no evidence that D. R. was in the legal custody of a parent or guardian during the time of her abduction.  We disagree.

Viewed in the light most favorable to the judgment (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480), the evidence shows the following.  On several occasions during the summer and fall of 2010, 17-year-old D. R. left home without stating where she was going.  She testified:  "Technically I didn't run away.  [¶] . . . [¶]  I don't run away.  There is no point.  I go back home."

In September 2010, 18-year-old E. L. was kicked out of her home and went to live with D. R. and her family.  E. L. remained for only a short time because D. R. experienced difficulties with her own mother and was asked to leave the residence.  But

---

[1]     Undesignated statutory references are to the Penal Code.

2

D. R. remained in contact with her mother and visited her in the days that preceded the charges of kidnapping, human trafficking, and abducting.

E. L. and D. R. were regular visitors to the apartment of April Hart. Around this time, both girls were introduced to defendant, the boyfriend of Hart. Hart worked as a prostitute and gave her prostitution earnings to defendant.

Around November 2010, Hart lent her electronic benefits transfer government assistance card to D. R. who used the card to make purchases without Hart's permission. Defendant learned of D. R.'s purchases and informed Hart. Defendant, Hart, E. L. and 15-year-old I. C. got into a car and went to confront D. R. The group found D. R. at her boyfriend's residence. E. L. was ordered to call D. R. over to the car. Immediately upon entering the middle backseat, D. R. was questioned about the card. When D. R. screamed for help, defendant told her to "shut up" and threatened to kill her. Defendant gave D. R.'s backpack to E. L. and told her to search it for evidence of theft. E. L. found receipts from card purchases.

The group eventually ended up back at Hart's apartment. When they arrived several people were waiting outside. At Hart's request a female neighbor beat up D. R. while the others cheered. During the fight, defendant studied the receipts recovered from D. R.'s backpack. Defendant told E. L. that the beating was punishment for D. R.'s theft. At some point, defendant joined the fight. He choked and kicked D. R., lifted her into the air, threw her to the ground, and dragged her by the hair into the apartment.

The group forced D. R. to don a dress and high heels and to pose for photographs that were then posted to a prostitution Web site. A few minutes later, a client responded to the post. The group returned to the car where Hart and I. C. told D. R. that she had to earn back the money she had stolen. Hart drove to a motel in the vicinity of Watt Avenue where D. R. was taken to a room and left with a man she did not know. The man attempted to put his penis in D. R.'s mouth but she bit it. When Hart learned this she beat up D. R. and then drove the group to a nearby residence. I. C. and D. R. were left at the

residence while defendant, Hart, and E. L. continued to a downtown motel. At the residence, D. R. sent a text message to her boyfriend who contacted D. R.'s mother. The next morning, when I. C. and D. R. returned to Hart's apartment, D. R.'s mother was waiting for her and took her home.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt. [Citations.] Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.] [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence. [Citations.] Issues of witness credibility are for the jury. [Citations.]" (*People v. Boyer, supra,* 38 Cal.4th at pp. 479-480.)

Section 267 provides: "Every person who takes away any other person under the age of 18 years from the father, mother, guardian, or other person having the legal charge of the other person, without their consent, for the purpose of prostitution, is punishable by imprisonment in the state prison, and a fine not exceeding two thousand dollars ($2,000)."

Defendant contends the "taking of a minor, who comes and goes as she pleases, from the company of her boyfriend," does not qualify as a crime under section 267. We disagree.

" 'The gist of the offense is the taking away of the child against the will of the person having lawful charge of her, for the purpose of prostitution . . . .' [Citation.]" (*People v. Dolan* (1892) 96 Cal. 315, 318.) "[W]hether [the minor] . . . wandered abroad at night [does] not affect . . . the question as to whether or not she was taken off while under the age of eighteen years, for purposes of prostitution, without the consent of her parents." (*Ibid.*) Thus, the facts that D. R. "wandered abroad" to the company of her

4

boyfriend and "comes and goes as she pleases" do not affect the question of whether she was taken while under age 18, for purposes of prostitution, without her parent's consent. (*Ibid*.) Defendant's argument, which confuses parental consent to the child wandering abroad with *consent to her being taken for prostitution*, has no merit.

Defendant relies on *People v. Flores* (1911) 160 Cal. 766, which reversed a defendant's section 267 conviction because there was insufficient evidence that the minor was under the lawful charge of her mother. The court explained: " '[W]here a female who has lost her virtue, under the age of eighteen, and *who has been abandoned, or who is not in the legal charge of any one*, but a wanderer upon the town, is aided in being placed in a house of prostitution, no crime has been committed. No one would say from the evidence in this record that the defendant took the girl from her mother. The words mean the removal or separation of the girl from the parent or legal guardian. If the girl was not with her mother or under the immediate control and custody of the mother, but living separate and apart from her, going from place to place of her own volition, not making her home with her mother, she was not "taken from the mother." ' " (*Id*. at p. 770; italics added.)

In the present case, the jury had no duty to conclude that D. R.'s mother abandoned D. R. or relinquished her legal charge of D. R. Although the mother asked D. R. to leave the house in mid-October 2010, she filed a missing persons report with law enforcement on November 2, 2010, shortly before the present offenses. Moreover, the mother responded to D. R.'s text message by waiting for D. R. outside of Hart's apartment and by taking D. R. home. For her part, D. R. testified that she "technically" does not run away and always returns home. She remained in contact with her mother and had visited the mother in the days prior to the taking. These facts show that D. R. remained in her mother's legal custody *and* that, contrary to defendant's argument, they enjoyed a substantive parent-child relationship in which the mother endeavored to protect D. R.'s safety and character. Nothing in section 267 suggests that its protection is

unavailable whenever family dynamics end up with a temporary separation of parent and child. Substantial evidence supports this charge. (*People v. Boyer, supra,* 38 Cal.4th at pp. 479-480.)

## II

### *Instructional Error*

Defendant next contends the trial court's placement of CALCRIM No. 1190 on noncorroboration of sexual assault crimes among the credibility instructions and immediately following CALCRIM No. 301 on the testimony of a single witness created a substantial likelihood that the jury misinterpreted the former as a credibility instruction, thus erroneously suggesting that the law requires special deference to D. R.'s credibility.

The People respond that defendant forfeited the claim by failing to object to the jury instructions, which were "correct in law and responsive to the evidence." (Citing *People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) Defendant replies that no objection was necessary because, as placed and given by the trial court, the instructions were misleading and thus *not* correct in law. (§ 1259.)

CALCRIM No. 301 told the jurors: "Except for the testimony of April Hart, which requires supporting evidence, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence."

Immediately after the foregoing instruction, CALCRIM No. 1190 told the jurors: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."

Defense counsel objected to CALCRIM No. 1190 on the grounds it was duplicative of CALCRIM No. 301 and "single[d] out a category of offense which I don't think is appropriate." The trial court overruled the objection, noting that the instructions have been upheld when given in conjunction. (E.g., *People v. Gammage* (1992) 2 Cal.4th 693, 700.)

6

In *Gammage,* the jury was instructed with CALJIC No. 10.60, the predecessor of CALCRIM No. 1190; and with CALJIC No. 2.27, the predecessor of CALCRIM No. 301. The defendant argued that, "in combination, the instructions create a preferential credibility standard for the complaining witness, or somehow suggest that that witness is entitled to a special deference." (*People v. Gammage, supra*, 2 Cal.4th at p. 701.) The court rejected the claim, stating: "Although the two instructions overlap to some extent, each has a different focus. CALJIC No. 2.27 focuses on how the jury should evaluate a fact (or at least a fact required to be established by the prosecution) proved solely by the testimony of a single witness. *It is given with other instructions advising the jury how to engage in the fact-finding process.* CALJIC No. 10.60, on the other hand, declares a substantive rule of law, that the testimony of the complaining witness need not be corroborated. *It is given with other instructions on the legal elements of the charged crimes.*" (*Gammage,* at pp. 700-701, italics added.) The court concluded "[t]he one instruction merely suggests careful review when a fact depends on the testimony of one witness. The other tells the jury there is no legal corroboration requirement. Neither eviscerates or modifies the other. As we observed early in this century, 'There was no singling out of the testimony of the prosecuting witness with a view of giving it undue prominence before the jury.' [Citation.] Nor do the instructions 'dilute[] the "beyond a reasonable doubt" standard.' [Citation.] The instructions in combination are no less correct, and no less fair to both sides, than either is individually." (*Id*. at p. 701.)

In this case, as in *Gammage*, CALCRIM No. 301 was given with other instructions advising the jury how to engage in the fact-finding process. But unlike *Gammage*, several procedural instructions separated CALCRIM No. 1190 from the other substantive instructions.

Defendant claims CALCRIM No. 1190's proximity to CALCRIM No. 301 and consequent separation from substantive instructions obscured the fact that CALCRIM Nos. 301 and 1190 "have a different scope." But the jury was instructed to "[p]ay careful

7

attention to all of these instructions and *consider them together*." (Italics added.) We assume that jurors are intelligent persons who are capable of understanding and correlating all jury instructions that are given. (*People v. Mills* (1991) 1 Cal.App.4th 898, 918; *People v. Kegler* (1987) 197 Cal.App.3d 72, 80.) There is no indication that the slight separation of CALCRIM No. 1190 from "other instructions on the legal elements of the charged crimes" caused the instruction to be misleading or prejudicial. (*People v. Gammage, supra*, 2 Cal.4th at p. 701.)

Defendant claims the "immediate juxtaposition" of CALCRIM Nos. 301 and 1190 made it reasonably likely that jurors believed the instruction to "carefully review all the evidence" did not apply to D. R.'s testimony. He reasons that, because CALCRIM No. 1190 does not repeat CALCRIM No. 301's cautionary language, jurors were reasonably likely to conclude the law "does not require a cautionary review" of D. R.'s testimony. We disagree.

"When reviewing an instructional ambiguity claim, we ask whether the jury was reasonably likely to have construed the instruction in a manner that violated the defendant's rights. [Citation.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1110.) We find no reasonable likelihood that the jury would understand the instructions as defendant suggests.

III

*Multiple Punishment*

Defendant contends section 654 prohibits multiple punishment for kidnapping D. R. and human trafficking of D. R. , because the intent and objective of the kidnapping was to facilitate the human trafficking. We disagree.

Section 654 provides in relevant part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

8

" 'The proscription against double punishment in section 654 is applicable where there is a course of conduct which . . . comprises an indivisible transaction punishable under more than one statute . . . . The divisibility of a course of conduct depends upon the intent and objective of the actor, and if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one.' [Citation.] 'The defendant's intent and objective are factual questions for the trial court; [to permit multiple punishments,] there must be evidence to support a finding the defendant formed a separate intent and objective for each offense for which he was sentenced. [Citation.]' " (*People v. Coleman* (1989) 48 Cal.3d 112, 162; see *People v. Latimer* (1993) 5 Cal.4th 1203, 1208.)

Defendant does not address the evidence supporting *the trial court's* implied finding of separate intents and objectives. Instead, he states without analysis or record reference that *the jury* found in effect that the kidnapping was for prostitution and, thus, the human trafficking for prostitution was "part of an indivisible course of conduct with the same intent and objective." The claim that the jury determined the purpose of the kidnapping, raised in such perfunctory fashion, is forfeited. (*People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4.)

The record supports the trial court's implied finding of separate, and consecutive, intents and objectives, first to inflict a do-it-yourself analog of *punishment* and then to exact do-it-yourself *restitution*.

The kidnapping count alleged that defendant "did take, hold, or detain [D. R.] by using force or by instilling reasonable fear to move her a substantial distance without her consent." The evidence showed that defendant and the others located D. R. at her boyfriend's residence. D. R. was transported a substantial distance to Hart's apartment where several people were waiting. At Hart's request, a female beat up D. R. Defendant admitted to E. L. that the beating was punishment for D. R.'s theft. This evidence amply

9

supports an implied finding that the intent and objective of the kidnapping was to physically punish D. R. for the card theft, not to force her into prostitution.

The human trafficking count alleged that defendant deprived or violated D. R.'s personal liberty while intending to commit pimping, pandering, or abduction of a minor for prostitution. The evidence showed that defendant forced D. R. to don a dress and high heels and to pose for photographs that were posted to a prostitution Web site. A few minutes later, a client responded to the post. Hart and I. C. told D. R. that she had to earn back the money she had stolen. Hart drove D. R. to a motel where she was taken to a room and left with a man who attempted to put his penis in D. R.'s mouth.

Thus, the evidence supports an implied finding that the intent and objective of the kidnapping was to inflict physical punishment upon D. R., while the intent and objective of the human trafficking was to exact restitution in the form of prostitution earnings. The separate punishments on these counts are supported by substantial evidence. (*People v. Coleman, supra,* 48 Cal.3d at pp. 162-163.)

IV

*Failure to Provide Medical Records*

Defendant contends the trial court's failure to provide exculpatory, relevant, or impeaching information contained in D. R.'s confidential medical records violated his confrontation and due process rights. In a separate argument, defendant contends due process requires a limited disclosure of the confidential material to the parties to allow briefing under seal of the foregoing contention. We disagree.

The defense subpoenaed the mental health records of D. R.'s stay, immediately following the kidnapping, at Heritage Oaks Hospital and asked the trial court to review the records in camera pursuant to *People v. Hammon* (1997) 15 Cal.4th 1117, which holds that such review must occur at trial rather than prior to trial. (*Id.* at p. 1128.) Counsel believed the records could indicate a health condition involving psychosis or hallucinations or a mental disorder with regard to sexual conduct, either of which would

10

be relevant to D. R.'s competency to testify as a witness and to her credibility at the time of the offense and at trial. Counsel argued the information was necessary to ensure defendant's rights to confrontation and due process.

The prosecutor objected that evidence of D. R. being a runaway, being incorrigible, harming herself, and similar matters constituted "improper character evidence" rather than anything that justified releasing confidential records. He acknowledged that the material was subject to *Hammon* review and expressed confidence that the court would identify any material that pertains to the relevance or credibility of D. R.'s testimony.

When asked by the trial court to explain how D. R.'s medical treatment could affect issues in the case, defense counsel stated: "It is hard. I can't give a particularized or more specific statement as to how it would be. But I think the things I indicated, if they -- if there is -- if any of those items, the history of psychotic or hallucinatory behavior, her life style [*sic*], her choice of how . . . who she's choosing to be with as far as her boyfriend is concerned who is a run-away [*sic*] and a suspect in a number of offenses that she -- her behavior in general whether it is self-mutilation, whether it is her conduct and have to [*sic*] be taken to basically a hospital as opposed to an outpatient facility in terms of was she placed on any type of medication, if so why. [¶] Those would all tend to show or could show that she was suffering from a possible condition that would affect her that would be relevant to her credibility or competency."

The trial court ruled that it would review the records in camera. It ordered the hospital to deliver the records to the court for review. The next day, the trial court stated that it had reviewed the record.

Small portions of three pages of records were released to the parties. The records indicated that D. R. had denied any physical abuse by her family and that she had reported a recent kidnapping by her friend's aunt. During the incident D. R. had been

11

beaten, drugged, and possibly abused. The records also indicated a separate incident in which police brought D. R. home after she stole merchandise from WinCo Foods.

The defense requested an Evidence Code section 402 hearing regarding the WinCo Foods incident and a matter unrelated to the Heritage Oaks records. Before D. R. testified, the prosecutor stated: "I think we covered this inlimine [*sic*], but I want to make sure there is [*sic*] no questions of her being put at [a mental health facility] or being a cutter or any type of mental issues, that there be [no] questioning in that area." At the hearing, D. R. explained that she and her cousin had tried to leave the store without paying for some cosmetics they had placed in a bag.

At defendant's request, we have reviewed the sealed materials in light of defense counsel's lengthy explanation of how the materials might be relevant to the defense and in light of the prosecutor's objection to matters such as D. R. being a runaway, being incorrigible, harming herself, and being placed at a treatment facility. Our review discloses that the disputed materials were within the scope of the objection, which the trial court impliedly sustained in that the materials were not released.

Defendant argues he "must contest this as error, and, in the nature of the situation, must do so blindly." But "blind[ness]" does not excuse defendant's failure to address the specific objection voiced by the prosecutor who had been equally "blind" to the records' contents. Although defendant cites authorities on confrontation (e.g., *Davis v. Alaska* (1974) 415 U.S. 308 [39 L.Ed.2d 347]), discovery (e.g., *Brady v. Maryland* (1963) 373 U.S. 83 [10 L.Ed.2d 215]), and due process (e.g., *Boddie v. Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113]), he does not claim the objection lacked merit or explain how excluding improper character evidence would have transgressed any of these constitutional rights. Any such claim is forfeited. (*People v. Hardy* (1992) 2 Cal.4th 86, 150; *People v. Wharton* (1991) 53 Cal.3d 522, 563.)

Defendant argues the trial court "made a *post facto* determination that there was nothing more in [D. R.]'s records pertinent or relevant or touching on the impeachment of

12

[D. R.]'s credibility," which implicates his "right to obtain information substantially pertinent to the cross-examination and impeachment of important witnesses for the prosecution."  The point fails because the in camera examination of the hospital records and the Evidence Code section 402 hearing preceded, rather than followed, D. R.'s testimony.  The in camera examination may have been "*post facto*" the discovery process but there is no right to pretrial disclosure of the records.  (*People v. Hammon, supra,* 15 Cal.4th at p. 1128.)

Noting his "limited . . . ability" to present his claim, defendant argues that due process and fundamental fairness require that the confidential records be released to counsel for both parties to enable the preparation and submission of briefing under seal. Defendant claims "[t]his is the *only* fair way to have review of the issue in question."  But he does not demonstrate that disclosure is the *only* means of obtaining a fair review.  At another point in his briefing, defendant "ask[s] this Court to review pages 127 through 161 of the first volume of the Clerk's Transcript on appeal, which are currently sealed against the parties and the public."  He offers no reason to believe this requested review will be unfair to him.  Thus, he has not shown that the limited disclosure is mandated by due process or fundamental fairness.

DISPOSITION

The judgment is affirmed.


          ROBIE          , J.


We concur:


      HULL          , Acting P. J.


      HOCH          , J.

Filed 4/2/14

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JUSTIN STEELE,<br><br>Defendant and Appellant. | C071857<br><br>(Super. Ct. No. 11F00219)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed March 7, 2014, was not certified for publication in the Official Reports. For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:

   HULL               , Acting P. J.

   ROBIE             , J.

   HOCH             , J.

_____

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts II, III, and IV of the Discussion.

1

EDITORIAL LISTING


APPEAL from a judgment of the Superior Court of Sacramento County, Eugene Balanon, Judge. Affirmed.

Mark David Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Kevin L. Quade, Deputies Attorney General, for Plaintiff and Respondent.